# ORIGINAL ●

LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatna, Guam 96910
TEL: (671) 472-7332
FAX: (671) 472-7215

FILED
DISTRICT COURT OF GUAM

NOV 05 2003

MARY L. M. MORAN
CLERK OF COURT

Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE

## DISTRICT OF GUAM

| | |
|---|---|
| CARMEN KATHERINE RODRIGUEZ, ) | CIVIL CASE NO. 02-00033 |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| JOSEPH E. MASTERS, ) | MOTION FOR DISMISSAL WITHOUT PREJUDICE |
| ) | |
| Defendant. ) | |

The United States hereby moves the Court for Dismissal of the above entitled case without prejudice.

The United States makes the Motion based on evidence it has received that the subject matter raised by the Plaintiff has recently been adjudicated before the Merit Systems Protection Board.

As evidence of the adjudication, the United States has been provided, from the DODEA Counsel's Office, an "Agency Post Hearing Brief" dated 28 August 2003. The Brief is attached as Exhibit A, as evidence of the issues adjudicated ( and not as an endorsement of the arguments asserted therein). No other filings from the Board or from Plaintiff have been provided to the United States at this time.

At page 2 of the Brief it states,

1    "Appellant filed a timely appeal with the United States Merit Systems
2    Protection Board, Seattle Field Office. A hearing in Guam was conducted
3    in this matter on 13 and 14 August 2003 and presided over by
4    Administrative Judge Carol J. Teather."
5 The United States has confirmed, orally, with Plaintiff's counsel that the hearing did take
6 place in a hotel here on Guam. No opinion has been issued by the Merit Systems
7 Protection Board at this time.
8      The United States believes that this request for dismissal without prejudice will be
9 unopposed and/or stipulated to by Plaintiff's counsel. Counsel for Plaintiff is Off-Island
10 for appellate arguments at this writing.
11      The United States is requesting that the dismissal be without prejudice because the
12 action would be for procedural reasons and not based on the merits or substance of
13 Plaintiff's claims.
14      The United States submits this motion and waives a hearing.
15      SO MOVED this 5th day of November, 2003.

17            LEONARDO M RAPADAS
                United States Attorney
18            Districts of Guam and NMI

20 BY:           _____
                MIKEL W. SCHWAB
21            Assistant U.S. Attorney

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**SEATTLE FIELD OFFICE**

|  |  |
|---|---|
| CARMEN K. RODRIGUEZ, ) | |
| ) | |
| Appellant, ) | DOCKET NUMBER |
| ) | SE-0752-03-0309-I-1 |
| v. ) | |
| ) | Date: 28 August 2003 |
| DEPARTMENT OF DEFENSE (DOD) ) | |
| DOMESTIC DEPENDENT ELEMENTARY ) | |
| AND SECONDARY SCHOOLS (DDESS) ) | |
| ) | |
| Agency. ) | |

## AGENCY POST-HEARING BRIEF

COMES NOW the Agency, and pursuant to the Order of the

Administrative Judge, submits the Agency's Post-Hearing Brief in this

case.

### I.

### STATEMENT OF THE CASE

Appellant, Ms. Carmen K. Rodriguez was a school teacher

employed by the Agency at the Domestic Dependent Elementary and

Secondary Schools (DDESS) Guam School District, Andersen

Elementary School, Andersen Air Force Base, Guam. By letter dated

18 February 2003, Appellant was notified of the Agency's intent to

**EXHIBIT**

A

remove her from Federal Service for Absence Without Leave (AWOL), Disorderly Conduct, and Failure to Follow Instructions. Following an oral and written response by the Appellant to the notice letter, the Agency notified Appellant by letter dated 8 May 2003 of the Deciding Official's final decision to remove Appellant 14 May 2003, which was subsequently amended by letter dated 12 May 2003. Thereafter, Appellant filed a timely appeal with the U.S. Merit Systems Protection Board, Seattle Field Office. A hearing in Guam was conducted in this matter on 13 and 14 August 2003 and presided over by Administrative Judge Carol J. Teather.

## II.

## STATEMENT OF FACTS

A. The Department of Defense has historically operated two statutorily distinct elementary and secondary school systems for children of military personnel. The overseas DoD schools are known as DoDDS (Department of Defense Dependents Schools) and operate pursuant to 20 U.S.C. § 921, _et seq_. The DoD Domestic Schools began their statutory authorization in 1951 pursuant to 20 U.S.C. § 241.

B. The DoD Domestic Schools were administered from 1950-1980 by the Secretary of Education who was charged to "make such arrangements as necessary" to provide free education for children

2

who reside on Federal property. Between 1980 and 1986, the Department of Education and the Department of Defense shared responsibility for the schools, and then in 1987, through the present, DoD assumed full fiscal, policy, and operational responsibility for the schools.

C. In 1994, Congress repealed 20 U.S.C. § 241 and reauthorized the DoD Domestic Schools under Public Law 103-337, codified at section 2164 of title 10, United States Code. (Tab 4kk.)

D. DDESS is a Federal agency charged to provide elementary and secondary education to eligible dependents of military members, and certain Federal civilian employees, who reside on military installations in the continental United States, and military members and Federal civilian employees who are assigned and working on the islands of Puerto Rico and Guam—U.S. Commonwealths, Territories, and Possessions. DDESS operates 69 elementary and secondary schools at 16 different locations in the southeast United States, West Point, New York, Guam, and Puerto Rico. The Guam DDESS District operates four schools: Andersen Elementary School (kindergarten through 5th grade) and Andersen Middle School (6th through 8th grade) located on Andersen Air Force Base; and South Guam Elementary/ Middle School (kindergarten through 8th grade) and Guam High School (9th through 12th grade) located on the Naval Base.

3

E.  Appellant was hired and appointed by the Agency on 15 September 1997 as an elementary school teacher at the Andersen Elementary School, Andersen Air Force Base.  (Tab 4jj.) [1]

F.  Mr. Joe E. Masters was assigned as the Andersen Elementary School Principal in September 2000.  As such, he and the Assistant Principal, Ms. Sharon Hall, were Appellant's supervisors.  While Appellant's duty performance was adjudged by Mr. Masters to be "fully successful" during his tenure at the school, Appellant had to be formally counseled on three occasions.  On 15 December 2000, Mr. Masters issued Appellant a Letter of Caution for her actions during a meeting with him in his office.  Appellant became upset and had to be reminded that she could not tape record conversations unless both parties agreed.  (Agency Exhibit (AE)-7.)  Then, on 24 September 2001, Ms. Hall issued Appellant a Letter of Caution for rude and discourteous behavior toward her on 20 September 2001.  Appellant made threatening remarks to Ms. Hall in a loud, insolent tone and manner.  (AE-9.)  Finally, on 26 March 2002, Mr. Masters once again counseled Appellant this time regarding the need for her to communicate with her peers in a professional, courteous, and respectful manner.  (AE-8.)

---

[1] DDESS professional employees such as Appellant work a 10-month year, *i.e.*, 190 work days; however, their pay is "spread" over a 12-month basis.

4

G.  On Tuesday, 8 October 2002, the Andersen Elementary School Principal, Mr. Joe E. Masters, went to Appellant's classroom and informed Appellant that the large metal storage cabinet in her classroom would have to be removed because it was a safety hazard to the children. [2] (Tab 4ii, p. 14; AE-2.)  Mr. Masters told Appellant that it would probably be Friday when the cabinet would be removed, but that she could retain the trays kept in the cabinet which students used to store supplies.  (*Id.*)  Appellant asked Mr. Masters if he would provide another cabinet and he said he would check around to see if there was a bookcase which could be moved to her classroom.  (*Id.*)  Mr. Masters testified that Appellant "seemed OK" with the decision to remove the cabinet.

H.  At approximately 10:30 a.m. on Thursday, 10 October 2002, Mr. Masters, while enroute to the cafeteria, went to Appellant's classroom to remind her that the metal cabinet would be removed the following morning, and that he had located a bookcase to replace it.  He also reminded her that she could keep the storage trays, but to please have them removed from the cabinet by the next morning.  Appellant stated she would.  (Tab 4ii, p. 14.)

---

[2]  Mr. Masters testified that the cabinet (48" x 36" x 18", 300 lbs. or more) had to be removed to bring the furniture in Appellant's classroom into compliance with Early Childhood Education standards for developmental appropriate furniture.  Similar cabinets had already been removed from all other classrooms.

5

I. On Friday morning, 11 October 2002, around 6:30 a.m., Mr. George Barnhart, the Supply Technician, informed Mr. Masters that he had placed the bookshelf in Appellant's classroom, but that she had not removed any of the trays from the large rolling cabinet. Mr. Masters and Mr. Barnhart went back to the classroom, removed the plastic trays, and stacked them in the bookshelf. (AE-5, photo number one). Mr. Masters testified that all of the trays and other contents were placed in the bookshelf and none were left on the floor. They then removed the large rolling metal cabinet. Mr. Masters told Mr. Barnhart that they would return later to assist Appellant in the placement of the bookshelf.

J. Mr. Masters went back to Appellant's classroom around 7:45 a.m. enroute to his duty of supervising school bus arrival. He testified that the lights in Appellant's classroom were out and no one was there. After bus arrival had concluded, about 8:10 a.m. or so, Mr. Masters returned to Appellant's classroom with Mr. Barnhart. Mr. Masters and Appellant testified differently as to what occurred next in the classroom.

Mr. Masters testified as follow: Upon entering the room he witnessed a student being videotaped by Appellant with other students apparently waiting in line to also be taped. The camera was on and the strobe light was brightly illuminated. Mr. Masters stated he heard the student say something to the effect that she wanted the cabinet

6

back, and they (children) could not find their things because their trays were stacked up on top of each other. Mr. Masters told Appellant that she should not be filming the students and that he and George Barnhart had come to assist her in the placement of the new bookshelf. [3] Appellant's response was to turn the camera on Mr. Masters and say: "Let's see what Mr. Masters has to say." Mr. Masters replied that he was there to speak with her and not the students. Appellant retorted: "I'll tape you instead," to which Mr. Masters replied that she should not tape him either, and that he was there to assist her with the bookcase.

At this point, Mr. Masters stated that Appellant became "very agitated" and asked "if I was going to get her something else" as the bookcase was too small. Mr. Masters told her that they did have another bookshelf right then and there. Appellant then became very angry, raised her voice, and demanded that more storage be placed in her classroom. Mr. Masters went over to another storage unit in the room and pointed out she could use that to store some of the students' supplies. Appellant responded in a loud voice that that space was for her "dittos" and her own personal use. She also pointed to another shelf and proclaimed: "That's my personal shelf."

---

[3] Mr. Barnhart came into the room, quickly fixed a shelf clip, and then departed.

Finally, Mr. Masters testified that because Appellant's emotions seemed to be running high, and her actions were having a negative impact on the children who appeared stressed, he decided that he should leave and address the matter with Appellant at a later time. As he turned to walk toward the classroom door, Appellant hollered: "The lawyer said I could keep everything in the room." Appellant then followed after Mr. Masters in a rather "aggressive" fashion and informed him that she would "add this to my complaint as well." As Mr. Masters opened the door, and proceeded to back out, Appellant came up to him (about 2 feet apart) and began waving her finger directly in his face saying in a loud voice: "Don't threaten me" or "You can't threaten me." Mr. Masters asked her not to point her finger at him and to please take it away from his face. Appellant retorted in a loud voice: "You are saying that you will get me out of here" or "put me out", or words to that affect. Mr. Masters told Appellant that that was not what he said, and walked away. As he departed the area, he heard Appellant hit the intercom button and yell for the Security Police.

Appellant, for her part, testified that Mr. Masters did tell her earlier that week that the cabinet would be removed on Friday, but claims he never said Friday morning. She avers that when she

8

returned to the classroom that morning with her students that the cabinet was gone and the children could not find their trays, that the situation became "chaotic." She stated they did not do the "Pledge", but rather she wanted to take a picture of the "mess", but did not have a camera. Accordingly, she used the video camera to "document the kids' feelings" about the loss of the cabinet. She testified that Mr. Masters came into the classroom, saw her videotaping, and said it was "OK." Then, when Appellant tried to videotape Masters, he "blocked" the camera lens, and she ceased taping and put the video camera down.

Appellant next testified that Masters was "looking around" while the children talked to him about their misplaced supplies, etc. She averred that Masters twice said: "I said I was gonna do what I said I was gonna do!" Next, Appellant said she didn't understand why the "cubby" could not stay, to which Masters yelled: "I said I was going to have it removed." Appellant informed Masters that he was "scaring the children" and that this whole incident would "come out at the Federal hearing" (meaning the EEOC hearing over her pending EEO complaint). She says Masters then screamed: "Are you threatening me . . . I'll put you out." Appellant responded with "You'll put me out?", and Masters again screamed: "I'll put you out." Appellant stated that she interpreted these words as a death threat, and described Masters as "enraged, menacing, and grinding his teeth."

Appellant then claims Masters shoved her backwards by pushing into her chest with his chest. She began shaking, crying, and couldn't regain her composure. Masters then went to the doorway and left as Appellant yelled: "You can't do this to me." She then called the front office for the Security Police.

K. Shortly after the incident with Mr. Masters, one of the school secretaries found Ms. Hall and asked her to go to Appellant's classroom right away because Appellant was very upset and requesting the Security Police. Ms. Hall responded and found Appellant crying hysterically and speaking in a loud voice: "That man had no right to do this to me." Ms. Hall asked her to leave the room but she refused and slapped her hand on the computer table stating: "I'm not leaving here until the Security Police come to this room and I make a statement about this whole incident." (Tab 4ii.)

After bringing in another secretary to work with the children, Ms. Hall spent about 30 minutes speaking with Appellant and calming her down. Ms. Hall asked Appellant if she felt well enough to attend two IEP (Individual Education Program) meetings at 9:00 a.m. and 10:00 a.m. She also offered Appellant the opportunity to see the school nurse, but Appellant declined.

10

L. Following the two IEP meetings, Appellant returned to her classroom and released her students at 11:15 a.m. [4] Appellant did not attend the planned professional development program (even though she was supposed to), but rather alleges she was traumatized and elected to remain in her classroom with a friend, Ms. Liz Flores. She claims they remained in the room with the lights off until 2:00 p.m. when they departed the building, went to the employee parking lot, and drove off.

M. On 11 October 2002, duty hours for teachers were 7:30 a.m. to 3:00 p.m. Ms. Hall testified that neither she nor Mr. Masters gave Appellant permission to leave early that day, nor had Appellant requested leave for that afternoon, or followed procedures for early departure, including "signing out." (Tab 4tt, pp. 4, 17.) Ms. Hall further testified that neither the Security police nor the Guam Police could locate Appellant between 1:00 and 1:40 p.m. Ms. Cynthia Donaldson reported that the Appellant's classroom was dark and the lights were off. (Tab 4ii.) However, she also reported that at approximately 1:50 p.m. she greeted some parents who stated they were there for a 2:00 p.m. parent/teacher conference. The school

---

[4] 11 October was an early release day for students because of a planned professional development program for the teachers that afternoon. Teachers were provided an additional ½ hour for lunch that day from 11:30 a.m. to 12:30 p.m. The program was to commence around 12:45 p.m. that day.

11

registrar, Ms. Deanna Price, testified that she was up on the hill
(northeast of the front of Andersen Elementary School) near the Child
Development Center smoking a cigarette at 1:40 p.m. and saw
Appellant depart the building at the rear door, walk to her white truck
in the parking lot, and then drive up the hill toward her. Appellant
then departed the area. Ms. Price immediately reported this to Ms.
Hall who asked her to check Appellant's classroom about 1:45 p.m.;
Ms. Price checked the room and found that the lights were off and the
door was locked.

N. Over the 3-day weekend (Monday, 14 October 2002, was a
Federal holiday), Appellant telephoned several of the parents of her
third grade students to discuss the incident that had occurred in the
classroom on Friday. (Tab 4ii, p. 40.) Appellant called one of these
parents, Ms. Deborah Webster, twice on Monday evening, 14 October,
and a third time on Tuesday morning, 15 October. Appellant's first call
on Monday evening was approximately 45 minutes in length, and Ms.
Webster described Appellant as a "nut case" and that the call "was so
bizarre that she began taking notes." (*Id.*) Ms. Webster stated:

> In this situation, the teacher has shown a complete
> absence of professionalism in a multitude of ways
> including: engaging in confrontation in front of her class,
> videotaping the children's opinion of the confrontation,
> crying in front of her class, calling parents with negative
> comments regarding administration, withholding report
> cards from the children, canceling parent conferences,
> and being absent from work without notifying
> administration of her intent.

12

(*Id.*)  Ms. Webster was upset by the calls and asked that her daughter be removed from the class if Appellant returned.

O.  On Tuesday, 15 October 2002, Appellant was absent without authority from her duty station, Andersen Elementary School.  Ms. Hall testified that she had not requested leave, obtained approval to be absent, nor had she telephoned the school to advise she would not be present.  Teachers who are going to be absent for a day and who have not requested and had leave approved in advance must call the school office between 6:30-6:45 a.m. on the morning of the day they are going to be out, so the school may obtain a substitute.  Ms. Hall testified that teachers are advised of this policy at orientation at the beginning of the year, and periodic reminders are placed in the daily school bulletin. (Tab 4uu, p. 2.)  By memorandum dated 15 October 2002, the Agency placed Appellant in a paid administrative leave status effective 16 October 2002 until further notice.  (Tab 4ff.)  The letter from the Agency was not delivered since the addresses which the Agency had on file, provided by the Appellant, were not accurate.  (Tab 4ee.)

P.  On 16 October 2002, Appellant called the school office at about 8:30 a.m. and told the secretary she would not be in for the rest of the week.  Ms. Hall testified that the secretary, Ms. Johnson, asked Appellant for a phone number and address.  Appellant would not

13

provide an address, but did give a telephone number. The Agency attempted to call Appellant at the number given, but a gentleman answered and stated Appellant was not there and didn't know where she was. The Agency had a policy that all teachers were required to have a current address and telephone number on file with the school office. Teachers were informed of this policy during orientation and in Daily Bulletins. (Tab 4uu, p. 2/Bulletin of August 22, 2002.)

Again on 18 October 2002, the Agency attempted to contact Appellant telephonically, to no avail. Thereafter, the school staff conveyed a message to a friend of Appellant, Ms. Flores, to contact Appellant and ask her to call Mr. Masters. (Tab 4dd.)

Q. On 31 October 2002, Appellant, through the Guam Legal Services Corporation, filed suit in the Superior Court of Guam seeking a temporary and permanent restraining order and injunction against Mr. Masters. However, the U.S. Attorney intervened in the matter and had the case removed to U.S. District Court where it is currently pending. (Tab 4cc.)

R. On 31 October 2002, Ms. Hall testified that they received a leave request (Family and Medical Leave Act) from Appellant for the period 15 October to 1 November 2002 accompanied by notes from Dr. Ericson and Dr. Duenas. (AE-6.) The notes indicated Appellant

14

was under their care for "asthma, situational anxiety, depression, and stress reaction." Then, on 1 November 2002, Ms. Hall received a one-page fax from Appellant asking the Agency to "accept her sick leave excuse." (Tab 4bb.) On the fax was a note from Dr. Ericson again indicating that Appellant was under care for asthma, insomnia and stress reaction. Ms. Hall sent the correspondence and leave requests to the Personnel Office who advised there was no need to act on it since Appellant was already on paid administrative leave.

S. On 7 November 2002, Appellant called Ms. Hall and asked whether her leave had been approved. Ms. Hall advised her that she did not need a doctor's note for administrative leave and that she was being paid. Ms. Hall asked Appellant if she had received the Agency's letter (advising her of administrative leave), and offered to send it again if Appellant would provide an address. Appellant declined.

T. On 12 November 2002, Appellant called the Assistant Principal, Ms. Hall. Ms. Hall told Appellant that several parents in her classroom were concerned about book orders for their children, and Ms. Hall asked Appellant if she knew where the books were. When Appellant stated the books were at her home (but she was too sick to drive them to the school), Ms. Hall offered to personally drive to the Appellant's residence and pick the books up; Appellant declined to provide an address. At that point, Ms. Hall told her to deliver them

15

to the Andersen Air Force Base main gate and Ms. Hall would ensure they were delivered to the children. Although Appellant agreed to this procedure, she did not follow it. Instead, Appellant gave the books to Ms. Flores and asked her to distribute them for her. (Tab 4aa.)

U. On 20 November 2002, Appellant sent a facsimile message to the Guam Superintendent, Dr. Richard Tom, which finally provided a mailing address and telephone number. Appellant requested a copy of the administrative leave letter and information concerning lesson plans. (Tab 4z.)

V. In early December 2002, the Agency elected to use the Guam DDESS Assistant Superintendent, Dr. Sue Burdick, as the point of contact for all employment-related matters with Appellant. On Monday, 2 December 2002, Dr. Burdick telephoned Appellant and asked her to come in for a meeting. Appellant stated she had a doctor's appointment to which Dr. Burdick replied: "Well, could you come before or after the doctor's appointment?" Appellant said that she would check, but called later and stated she couldn't' make it. The same discussion was held on Tuesday, 3 December 2002, except Appellant called back later in the day and said she didn't know when she would be better, and that Dr. Burdick should not call again.

16

On Thursday, 5 December 2002, Dr. Burdick called Appellant and advised her that she was on paid administrative leave and needed to come in for a meeting or the Agency would have to change her pay status to AWOL. Appellant responded with a sick leave request for 5 and 6 December 2002. (Tab 4y.) The Agency approved the request.

W. The Guam School District was closed during the period 9 through 20 December 2002 due to a typhoon, and then from 20 December 2002 until 6 January 2003 for the holiday break. Appellant was provided paid administrative leave from 9 through 20 December 2002 as was given to all employees.

X. At approximately 7:30 a.m. on 6 January 2003, Appellant telephoned the Andersen Elementary School and advised the Office Assistant that she was sick, and would be sick through 17 January 2003. (Tab 4x.)

17

Y. On 9 January 2003, Appellant sent a 6-page facsimile to Ms. Hall, Andersen Elementary School Assistant Principal. [5] (Tab 4w.) Included therein was a SF-71 requesting "Other Paid Absence" for the period 5-20 December 2002, and a SF-71 requesting "Other Paid Absence" for the period 6 January 2003-14 February 2003. Appellant requested "administrative leave and/or Workmen's Compensation leave form for 6 January-14 February 2003 for continued medical problems with severe asthma and severe stress reaction." Accompanying the SF-71 was a medical slip from "The Doctor's Clinic."

---

[5] Page 3 of the fax is difficult to read, but the Agency's "translation" is set forth below:

> Re: Administrative Leave form 05-20 Dec 02
> -Administrative Leave and/or Workmen's Com. For
>    06 Jan-14 Feb 03
> Dr.'s excuse note for 06 Jan-14 Feb 03
> Non-receipt of Notification of Administrative
> Leave Letter (months)

Please accept the following:

1. Dr.'s excuse note for 06 Jan-14 Feb 03.

2. Administrative leave form for 05-20 Dec 02 due to asthma flare, Severe stress reaction, (W___, Burdick) and Super Typhoon Pongsoria.

3. Administrative leave and/or Workmen's Compensation leave form for 06 Jan-14 Feb 03 for continued medical problems with severe asthma and severe asthma reaction. Please mail all Agency signed leave forms since 15 Oct 02 via certified mail to: PO Box 10482, Tamuning, Guam 96931 or give the copies to Ms. Elizabeth Flores, my chosen representative. Failure to accept Ms. Flores as my representative will cause legal problems and can be viewed as an unfair labor practice among other legal problems.

4. I still have not received my copy of the Administrative Leave notification since last year. I consider this to be an unfair labor practice since I have asked for this repeatedly and have been repeatedly denied. Is this showing good faith?

18

Z. By letter dated 14 January 2003, the Guam DDESS Assistant Superintendent, Dr. Sue Burdick, advised Appellant of the following:

(1) Address, telephone numbers, and identification of Agency "point of contact" for all employment-related matters;

(2) Appellant's sick leave request for 5 and 6 December 2002 had been approved, as well as her request for administrative leave for the period 9-20 December 2002, because of the typhoon;

(3) Administrative leave for the period 6 January—14 February 2003 was disapproved since the medical documentation provided was insufficient for the Agency to determine the appropriateness of sick leave;

(4) Effective 6 January 2003, Appellant was placed in an AWOL non-pay status which would continue until she requested sick leave or leave without pay. Such a request must be supported by appropriate medical documentation from her physician. A "list of requirements" and a position description were attached for Appellant to provide to her physician;

(5) Continuing AWOL may form the basis for a disciplinary action;

(6) Worker's Compensation claim forms were also attached for Appellant's use.

19

(Tab 4v.)  The letter was provided to Appellant's designated representative, Ms. Elizabeth Flores.

AA.  On 28 January 2003, Appellant sent a facsimile to Dr. Richard Tom, Guam Superintendent.  Attached to the cover memorandum was a completed "Attending Physician's Report" for a Worker's Compensation Claim.  (Tab 4u.)  On the following day, Appellant sent another facsimile to Dr. Tom which included a Form CA-1 "Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation."  (Tab 4t.)  Appellant alleged in block 13. of the form that "Mr. Masters terrorized and assaulted me threatening my life."  Also enclosed with the facsimile was Appellant's "Designation of Representative" form, which the Agency had sent to her as an attachment to its letter of 14 January 2003.

BB.  During the week of 3-7 February 2003, several parents whose children were in Appellant's classroom complained to school employees that they had been contacted by the Guam Police Department and asked to bring their child to their office to make a statement regarding the 11 October 2002 incident.  (Tab 4s.)  Also on 7 February 2003, at the Superintendent's request, Agency counsel sent a draft "CA-1 Supervisor's Statement" to DDESS Guam officials in order to respond to Appellant's Worker's Compensation Claim.  (Tab 4r.)

CC.  On 13 and 14 February 2002, before the Agency finalized Appellant's CA-1 file for submission to the Department of Labor, Appellant withdrew her Worker's Compensation Claim "effective immediately."  (Tab 4q.)

DD.  Dr. Burdick testified that Appellant did not report for work at any time between 6 January and 18 February 2002.  Also she never submitted any medical documentation as identified in the attachment to the Agency's 14 January 2003 letter.  (Tab 4v.)

EE.  On Tuesday morning, 18 February 2003, Appellant came to Andersen Elementary School at approximately 7:30 a.m.; at that time, she was advised by Ms. Hall to report to the District Office.  (Tab 4p.) Later that day, Appellant arrived at the District Office and met with the Assistant Superintendent, Dr. Sue Burdick, who served her with a Notice of Proposed Removal for:  Absence Without Leave (AWOL); Disorderly Conduct; and Failure to Follow Instructions.
(Tab 4o)  Dr. Burdick thereafter wrote a memorandum of her meeting with Appellant that day.  (Tab 4n)  Appellant was placed in a paid administrative leave status pending the final decision in her case.

FF.  By memorandum dated 26 February 2003, the proposing official, Dr. Burdick, advised Appellant that the Deciding Office in her case would now be Mr. Doug Kelsey, Acting Guam DDESS Superintendent.  (Tab 4m.)

21

GG.  On 10 March 2003, Appellant made her oral presentation to the Deciding Official, Mr. Doug Kelsey, Acting DDESS Guam Superintendent.  (Tab 4l.)  A few days later, Appellant provided the remainder of her written presentation.  (Tab 4k.)  During Appellant's oral presentation to Mr. Kelsey she made several allegations of sexual harassment by Mr. Masters. [6]  Mr. Kelsey asked her for more specific information which she provided by facsimile on 3 April 2003.  (Tab 4j.)  Thereafter, Mr. Kelsey conducted an informal inquiry into the allegations.  (Tab 4i.)  The inquiry did not reveal any improper conduct or actions by Mr. Masters which would call into question his credibility.  Also, on 14 April 2003, Mr. Kelsey received a facsimile message from Appellant which stated:

---

[6] Appellant also testified about these allegations at the hearing.  She averred there were three incidents of sexual harassment by Mr. Masters during the period September 2000 through December 2001.  The first incident occurred shortly after Mr. Masters' arrival at the school.  Appellant claims that he "anchored" her hand when they shook hands at a welcome breakfast and then he "undressed me with his eyes."

The second incident occurred a couple of months later in the fall of 2002 when Mr. Masters met Appellant outside the school while she was proceeding to her classroom.  He allegedly came up to her, smelled her perfume, and said "Smells good" while he looked at her.

The third incident occurred at the District Christmas party in December 2001 at a Guam hotel.  Appellant claimed that Mr. Masters was dancing lewdly with another teacher, and she was repulsed by his behavior.  She then refused to dance with him and Mr. Masters gave a "dirty look."

Although Appellant testified that she considered these serious incidents of sexual harassment, she never filed a complaint of discrimination about them.

Please accept this note from Dr. Erickson which reads, "Carmen Rodriguez had severe exacerbation of asthma which was difficult to control and required multiple office visits and near hospitalization and aggressive medical management". Also, please send your response regarding the status of my employment to": P.O. Box 10482, Tamuning, Guam 96931. I would also like Ms. Liz Flores, my authorized representative, to receive a copy of your response. Thank you.

The doctor's statement was attached. (Tab 4h.)

HH. On 5 May 2003, Appellant filed an unfair labor practice charge against the Agency and Mr. Masters. (Tab 4g.)

II. By memorandum dated 8 May 2003, Mr. Kelsey notified Appellant of his findings concerning the allegations contained in the Notice of Proposed Removal letter. (Tab 4f.) Although Mr. Kelsey did not sustain all alleged specifications, he did sustain all three charges by a preponderance of the evidence. The letter advised Appellant that she be would removed from Federal service effective "14 April 2003." (Paragraph 2 of the letter.) Since the letter cited the wrong month, the Agency sent another letter on 12 May 2003 notifying Appellant that the effective date of her removal would be 16 May 2003. (Tab 4e.) The notice provided Appellant of her available appeal rights.

JJ. Also on 12 May 2003, Appellant sent Mr. Kelsey a facsimile which posed five questions. (Tab 4d.) Mr. Kelsey and Dr. Burdick responded on 19 May 2003. (Tab 4c.)

23

KK. Appellant was removed from Federal service effective 17 May 2003. (Tab 4 b.) Thereafter, she filed a timely appeal of the action with the Seattle Field Office of the U.S. Merit Systems Protection Board. (Tab a.) The appeal was received on 13 June 2003. A hearing was conducted in Guam on 13 and 14 August 2003.

LL. Following the hearing, the Administrative Judge directed the Agency to submit an exhibit on Appellant's available sick leave for School Year 2002-2003. The Agency submitted that information on 22 August 2003. (AE-10.)

## III.

## STATEMENT OF ISSUES

A. **Was The Agency's Action In Removing The Appellant From Her Position As A Teacher With The Guam DDESS District For Such Cause As To Promote The Efficiency Of The Service And Was The Penalty Within The Bounds Of Reasonableness?**

B. **Did The Agency Violate Title VII Of The Civil Rights Act Of 1964, As Amended, By Engaging In Illegal Discrimination When It Removed Appellant From Her Position?**

C. **Did The Agency Fail To Follow Progressive Discipline In Effecting Appellant's Removal?**

## IV.

## ARGUMENT

A. **The Agency's Action In Removing Ms. Rodriguez From Federal Service Was Taken For Such Cause As To Promote The Efficiency Of The Service, And Was Within The Bounds Of Reasonableness.**

24

## 1. **Standard of Review**.

In the adjudication of an adverse action effected by an Agency, the Board is required to make three separate and distinct determinations: (1) that the misconduct charge is sustained by a preponderance of the evidence; (2) there is a sufficient nexus between the misconduct and the efficiency of the service; and (3) that the penalty imposed by the Agency is reasonable in light of the specific facts and circumstances involved in the case. 5 U.S.C. 7701(c)(1)(B); King v. Frazier, 77 F.3d 1361 (Fed. Cir. 1996); Webster v. Dept. of Army, 911 F.2d 679 (Fed. Cir. 1990); Danese v. IRS, 11 M.S.P.R. 97 (1982); Lanza v. Dept. of Army, 67 M.S.P.R. 516 (1995); Risner v. FAA, 7 M.S.P.R. 480 (1981); Parsons v. Dept. of Air Force, 707 F.2d 1406 (D.C. Cir. 1983); Hayes v. Dept. of Navy, 727 F.2d 1535 (Fed. Cir. 1984); Douglas v. VA, 5 M.S.P.R. 280 (1981).

The MSPB will not disturb the Agency's selected penalty if it is the maximum reasonable penalty which may be imposed considering all the relevant factors. Weiss v. USPS, 700 F.2d 754, 757 (1st Cir. 1983); Valdez v. DOJ, 65 M.S.P.R. 390, 398 (1994); Beard v. GSA, 801 F.2d 1318 (Fed. Cir. 1986); Crawford v. DOJ, 45 M.S.P.R. 234, 237 (1990); Carosella v. USPS, 816 F.2d 638, 643 (Fed. Cir. 1987); DeWitt v. Dept. of Navy, 747 F.2d 1442, 1445 (Fed. Cir. 1984); Newton v. Dept. of Air Force, 85 F.3d 595 (Fed. Cir. 1996).

Part 1201.56 of title 5 of the Code of Federal Regulations (C.F.R.) defines the burden of proof for adverse actions as a preponderance of the evidence. A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. 1201.56(c)(2). The MSPB previously offered this statement of the meaning of preponderance of the evidence in Johnson v. Dept. of Air Force, 13 M.S.P.R. 236, 238 (1982): "Preponderance of the evidence exists when such evidence has, when considered and compared with that opposed to it, more convincing force and produces in the mind of the trier of fact a belief that such evidence is more likely true than not true."

In this case, there are three charges which the Agency asserted as the basis for the action: (1) one charge of absence without approved leave (AWOL) with three underlying specifications; (2) one charge of disorderly conduct with two underlying specifications; and

Case 1:02-cv-00033    Document 24    Filed 11/05/2003    Page 28 of 58

(3) one charge of failure to follow instructions with four underlying specifications. The evidence of record has easily established all three charges by the requisite preponderance of the evidence standard.

## 2. The Misconduct Is Sustained By Preponderance Of The Evidence.

### a. Charge I, Specification 1.

In this specification, the Agency charged that the Appellant left the work site (Andersen Elementary School) early at 1:40 p.m. on Friday, 11 October 2002 without authority and without first having obtained approval for leave. Ms. Sharon Hall, Andersen Assistant Principal, testified directly that duty hours on that day were 7:30 a.m. until 3:00 p.m., that Appellant had not requested leave, either sick or personal, and that neither she nor Mr. Masters had given her administrative leave or permission to leave early.[7] Further, Ms. Hall testified that if an emergency arises and a teacher must depart early, he/she must request leave and have it approved, or otherwise obtain permission prior to departing the work site.

---

[7] Under the parties' collective bargaining agreement, teachers do not earn annual leave as do other Federal employees. Rather, they earn 3 days of personal leave annually.

Case 1:02-cv-00033    Document 24    Filed 11/05/2003    Page 29 of 58

The Appellant herself admitted she left the school early that day without permission and without first obtaining approval for leave. [8] Although Appellant contends she was "traumatized," had not eaten lunch, and was ill, the facts do not support her claims. First, if Appellant was so ill, then why did she decline medical assistance from the school nurse when Ms. Hall offered? Secondly, why had she not eaten lunch when teachers were given twice the normal allotted time for lunch that day, *i.e.,* one hour instead of 30 minutes? Lastly, if she was so "traumatized," and did not want to see or meet Mr. Masters, then why didn't she use the intercom to call the front office, or ask Ms. Flores to obtain leave or permission to depart early?

Following the incident with Mr. Masters, Appellant willingly participated in two IEP meetings with parents and other staff members, retrieved her students from the playground, and then dismissed them. Only some 5 ½ hours after the incident did the Appellant leave the work area. Nothing in her behavior would lead a reasonable person to believe she was not capable of following established leave procedures prior to her early departure.

---

[8] Appellant claims she did not leave until 2:00 p.m., but Ms. Deanna Price clearly saw Appellant leave the building at 1:40 p.m., and get in her white truck, and drive off. There is no reason to disbelieve Ms. Price, and her testimony is clearly more credible than Appellant on this issue.

28

## b. **Charge I, Specification 2**.

The second specification of AWOL occurred on 15 October 2002, the first work day following the incident and a 3-day Federal holiday weekend. On that Tuesday, Appellant failed to report for duty and had not requested and obtained approval for leave, or notified the school early that morning (between 6:30 and 6:45 a.m.) that she would not be present for work. The testimony of Ms. Hall was undisputed that Appellant did not report to work on 15 October 2002, nor did she request leave or notify school officials of her absence.

Again, the Appellant claims she was too ill to either come to work or call in and request leave. But was she really so ill as to render her incapable of following established leave procedures or notifying the school that she could not come in that day? The facts indicate that Appellant made multiple telephone calls (some of them quite lengthy) to many of the parents of her students from Friday afternoon though Monday evening (11-14 October 2002). (Tabs 4ff, 4gg, and 4ii.) If the Appellant was capable of making all of these other calls that weekend, as well as well as preparing lesson plans for the substitute teacher, then how could she be incapable of following leave procedures or at least calling the school office to advise of her absence? The answer, quite simply, is that she was not incapacitated that day, and could easily have contacted school officials telephonically.

29

### c. **Charge I, Specification 3.**

The third specification of Charge I alleges that Appellant was absent from her duty from 6 January through 14 February 2003, that this absence was without authority and that Appellant's request for administrative leave had been denied. The evidence reflects that on January 6th, the Appellant called the school secretary at 7:30 a.m. (and not between 6:30-6:45 a.m. as she was supposed to) and stated she was "calling in sick for today, and the rest of the week, and next week also." (Tab 4x.) The Appellant requested administrative leave (not sick leave). Then, on 9 January 2003, Appellant faxed in a leave slip for the period 6 January-14 February 2002 wherein she requested "Other Paid Absence" and then noted in the "Remarks" section the following: "Administrative Leave and/or Workman's Compensation due to severe asthma, severe stress reaction." (Tab 4w.) About a week later, the Agency sent Appellant a detailed letter wherein she was specifically advised that her request for administrative leave had been disapproved, and that the medical documentation she had submitted (Tab 4w) was insufficient to establish incapacitation and allow the Agency to determine if sick leave was appropriate. (Tab 4v, p. 2., para. (5).) The letter went on to advise Appellant how to provide appropriate medical documentation, and what to give her physician(s). (_Id_.) Dr. Burdick testified that in spite of this very specific and detailed warning, Appellant never submitted a sick leave or LWOP request, or medical

30

documentation. Under these circumstances, the AWOL offense should be sustained despite the physician testimony of Doctors Ericson and Leon-Guerrero at the hearing.

### d. **Impact Of Medical Documentation First Submitted At Board Hearing.**

To sustain a charge of unauthorized absence, the Agency must show, by preponderant evidence, that the Appellant was absent and that the absence was not authorized or that a request for leave was properly denied. Cooke v. U.S.P.S., 67 M.S.P.R. 401, 404, aff'd 73 F.3d 380 (Fed. Cir. 1995); Williams v. U.S.P.S., 68 M.S.P.R., 150, 156 (1995); Boscoe v. Dept. of Agriculture, 54 M.S.P.R. 315, 325 (1992). While it is not uncommon for an Agency to charge an employee with two separate charges, one for AWOL and one for failure to follow established leave procedures, the Agency did not do so in this case. Instead, the Agency only used the charge of AWOL for the attendance related conduct. In specifications 1 and 2 of Charge I, the Agency asserts the employee was AWOL as a result of failure to follow established leave procedures. The evidence clearly establishes this to be the case.

To defeat the charge of AWOL, the Appellant attempts to rely upon medical documentation submitted for the first time at the hearing. Appellant's efforts must fail. The Board held in Zeiss v. VA, 8 M.S.P.R. 15, 17-19 (1981) that an employee may produce medical

31

documentation for the first time at a Board hearing and thus establish a medical condition warranting the approval of sick leave. However, the Board found that such late submission does not remove the employee's obligation to follow established leave procedures as provided for in 5 C.F.R. 630.402 which requires an employee to apply for sick leave within the time limits set by the Agency, nor does it remove the requirement in 5 C.F.R. 630.403 which provides for an agency to grant a request for sick leave **only** when such request is supported by administratively acceptable evidence. The Board distinguishes <u>Zeiss</u> from similar cases where the submission of medical documentation for the first time at the hearing may be determinative of the outcome. These cases, unlike <u>Zeiss,</u> involved an employee following proper leave procedures and being charged with AWOL solely based upon a failure to submit medical documentation, or involved instances where the employee had a mental disability or illness which precluded submission of medical evidence earlier or precluded ability to follow established leave procedures.

The instant case, however, is on point with <u>Zeiss</u> in that the Appellant failed to follow proper leave procedures on 11 October and again on 15 October 2002 and the employee has admitted she did not follow established leave procedures. In neither instance is there any

32

medical documentation or evidence to support a finding that the Appellant had a mental disability or illness which would have rendered her unable to follow established leave procedures.

In the third specification of AWOL, the Appellant was absent, her request for administrative leave was properly denied, and her absence was not authorized. By letter dated 14 January 2003 (Tab 4v), the Appellant was placed on clear notice that: (1) her request for administrative leave was disapproved for 6 January through 14 February 2003; (2) she was placed in an AWOL status effective 6 January 2003 and would remain in such status until, and if, she requested sick leave or leave without pay; (3) that her AWOL status might be changed if she requested leave and the leave request was substantiated by appropriate medical documentation; and (4) the charge of AWOL could form the basis for disciplinary action. It is undisputed, however, that Appellant did not submit a request for sick leave or leave without pay for the period 6 January 2003 through 14 February 2003 and that she failed to provide the requisite medical documentation until the day of the hearing. The Board held in <u>Morris v. Dept of Air Force</u>, 30 M.S.P.R. 343, 345-46 (1986) that if the employee is warned in writing that he/she must provide medical evidence and fails to do so until the hearing, the discipline for AWOL

33

should be sustained. This conclusion was reached again by the Board in <u>Vigil v. General Services Administration</u>, 102 F.M.S.R. 81771 (2002).

Even assuming, *arguendo*, that the Appellant should have been granted sick leave that was available for her use beginning on January 2003, the Appellant would still have had a significant period of absence above the amount of sick leave available for her use. On 6 January 2003, the Appellant only had 84 hours of sick leave. [9] Applying that leave beginning on 6 January 2003 would have resulted in her being on approved sick leave 6 through 17 January 2003 and for four (4) hours on 20 January 2003. Appellant would not have had sufficient sick leave to cover four (4) hours of her absence on 20 January 2003 and for eight (8) hours per day for the period 21 January through 14 February 2003 for a total of 156 hours.

The granting of leave without pay (LWOP) for the remainder of the Appellant's absence was a matter of absolute administrative discretion by the Agency as employees have no entitlement to LWOP as a matter of right. <u>Gross v. Dept. of Justice</u>, 77 M.S.P.R. 83, 90 (1997); <u>Ellshoff v. Dept. of the Interior</u>, 76 M.S.P.R. 54, 71 (1997);

---

[9] Professional bargaining unit employees in Guam do not accrue sick leave on a per pay period basis, instead their sick leave (13 days or 104 hours of leave) is "front-loaded" at the beginning of the school year. They then may carry over any unused sick leave balance to the next school/leave year. AE-10, the Declaration of Pauline Barcinas, established that once 16 hours of sick leave were deducted for Appellant's absence on 5 and 6 December 2002, she only had a balance of 84 hours of sick leave available for use.

34

Wells v. Dept of Health and Human Services, 29 M.S.P.R. 346, 348 (1985). Employees generally have no right to LWOP in place of AWOL. Connor v. U.S.P.S., 5 M.S.P.R. 131, 133 (1981). When an AWOL charge is due to a denial of a request for LWOP because the employee's accrued leave is exhausted, the Board will review the circumstances of the denial to determine if it was reasonable. Fisher v. Dept. of Defense, 54 M.S.P.R. 675, 679 (1992). In light of the notification to the Appellant of the need to provide medical documentation and the consequences of failing to do so, her failure to provide the required medical documentation would warrant a disapproval of leave without pay for the 156 hours of absence above accumulated sick leave. Such a disapproval of leave would not be an abuse of Agency discretion under the circumstances of this case.

The Agency has proven, by preponderant evidence, that the Appellant was AWOL on 11 October 2002, was AWOL again on 15 October 2002, and was AWOL again for at least 156 hours (the amount of absence above her accumulated sick leave balance), if not for 240 hours (the period of the entire charged absence forming the basis for this specification). As a result, the Agency's charge of AWOL should be sustained.

### e. **Charge II, Specification 1.**

This specification alleges that Appellant engaged in disorderly conduct in her classroom on the morning of 11 October 2002 during an

35

incident with school Principal Joe Masters. Each party's version of the events that morning was summarized above in section II.J. For all the reasons stated below, the Agency asserts that Mr. Masters is by far the more credible witness as to what actually occurred.

Both stories aver that one of the two individuals (either Mr. Masters or the Appellant) became extremely emotional and angry at the other person. The question is, which one? The Appellant, herself, admitted on direct examination that even **before** Mr. Masters entered the classroom, she was "pretty miffed about it," *i.e.,* the removal of the "cubby organizer." Accordingly, there is at least one objective fact indicating that the person who was most likely to overreact that morning was not Mr. Masters, but rather the Appellant. [10]

Next, Appellant testified that the children were upset over the removal of the cabinet; in fact, she testified that things became "chaotic" before Mr. Masters entered the room. And what was the Appellant's cure for this chaos? She grabbed a video camera and began filming her students to "document their feelings." Is this the response of an experienced educator, or the guile of a subordinate out to entrap her superior?

---

[10] The evidence also reflects that even before the incident in question on 11 October 2002, Appellant had to be formally counseled in writing on three separate occasions in 2000, 2001, and earlier in 2002 for her unprofessional, discourteous, and inappropriate remarks to her supervisors and peers. Thus, there can be no doubt as to which of the two individuals was most likely to become enraged over seemingly inconsequential events.

36

To believe the Appellant's story, you must believe that:

(1) Mr. Masters told Appellant it was okay for her to videotape the children as she claimed on direct examination despite having briefed the entire faculty in August that such videotaping without parental consent was not permitted;

(2) Mr. Masters, a male supervisor against whom Appellant had already filed EEO complaints, would become so embroiled over a small incident such as the removal of a cabinet from a classroom, that he would shout at a female subordinate in front of small children, verbally and physically assault that employee, and threaten her; and

(3) Ms. Sharon Hall lied about her interaction with Appellant right after the incident, to wit: Ms. Hall ordered Appellant not to talk to her students; that Appellant told Ms. Hall that Mr. Masters had threatened her life and Ms. Hall's response was to the effect she didn't want to discuss Mr. Masters; and that Ms. Hall did not attend the IEP meetings so she could perform "damage control."

In summary, the Appellant's recitation of the incident with Mr. Masters on 11 October 002 in her classroom is simply not credible. Mr. Masters' version of the facts, as alleged in Specification 1 of Charge II, is clearly the honest truth of what actually occurred that morning.

37

## f. **Charge II, Specification 3.**

The facts behind this charge were reflected in the testimony of

Ms. Deborah Webster, and in Tab 4gg, Ms. Webster's detailed

memorandum compiled contemporaneous with the Appellant's phone

calls. That the Appellant's conduct during those calls was disorderly

and inappropriate there can be no doubt. Ms. Webster said it best in

the closing of her letter to Ms. Hall:

> In this situation, the teacher has shown a complete
> absence of professionalism in a multitude of ways
> including: engaging in a confrontation in front of her
> class, videotaping the children's opinion of the
> confrontation, crying in front of the class, calling
> parents with negative comments regarding admini-
> strators, withholding report cards from the children,
> canceling parent conferences, and being absent from
> work without notifying administration of her intent.

(Tab 4gg, p. 3.) Ms. Webster testified that Appellant's calls were very

disconcerting to her and her husband, and that she so questioned

Appellant's mental stability as a teacher that she asked Ms. Hall to

remove her daughter, Danney, from the class if Appellant returned.

This specification has clearly been proven by a preponderance of the

evidence.

## g. **Charge III, Specification 1.**

This specification alleged that Appellant failed to follow school

instructions to sign out before leaving school grounds prior to the end

of the duty day on 11 October 2002 when she departed at

approximately 1:40 p.m.

38

In support of this specification, the Agency offered the testimony of Sharon Hall who described this policy and that it was briefed to teachers during orientation at the beginning of the school year. Ms. Hall also stated that the issue is specifically covered in the teacher's handbook. Ms. Deanna Price, school registrar, further testified that on that afternoon she was on her lunch break smoking a cigarette next to the Child Development Center and clearly saw Appellant drive off at 1:40 p.m. (Tab 4tt, pp. 4 and 17.) Thus, there can be no doubt that Appellant was on notice of the policy and chose to disregard it.

### h. **Charge III, Specification 2.**

Here, the Agency asserted that Appellant violated the school policy that all employees must have a current phone number and address on file with the school office.

As evidence of Appellant's failure to comply with this instruction, the Agency presented the testimony of Ms. Sharon Hall. Ms. Hall testified that this policy was briefed to all teachers during orientation at the beginning of the school year, and advised again periodically in Daily Bulletins. (Tab 4uu, p. 2, Bulletin of August 22, 2002.) Ms. Hall further testified that school officials tried to telephone Appellant on 16 October 2002 at a number provided that morning, and that a gentleman answered and said Appellant wasn't staying there and he did not know where she was.

39

Similarly, Ms. Hall also testified that they attempted to send Appellant the letter of 16 October 2002 placing Appellant on administrative leave but that the letters were returned unclaimed from a post office box address on file. (Tab 4ff.) Delivery was also attempted by DHL to Appellant's address on file in the personnel office to no avail.

Although Appellant testified at the hearing that the Agency had a good telephone number on record for her, if that was true, then why did Appellant specifically tell Ms. Webster not to give out her telephone number to school officials when she called Ms. Webster on Monday evening, 14 October 2002? (Tab 4gg, p. 10.)

### i. **Charge III, Specification 5.**

The misconduct here concerns Appellant's failure to follow the school policy of not videotaping students without obtaining prior parental consent. Mr. Masters addressed this issue during his direct examination. He testified that teachers were informed of this policy orally during the orientation conducted on 5 and 6 August 2002, and that Appellant was present during this program. (Tab 4pp.) Several parents were clearly upset because of Appellant's action in videotaping her students on 11 October 2002 without obtaining their permission first. (Tab 4gg; p. 4ii.) There can be no question that this offense has been proven by a preponderance of the evidence.

### j. **Charge III, Specification 6.**

The last specification of this charge concerns Appellant's failure
to follow Ms. Hall's instruction on 12 November 2002. Ms. Hall
testified that on that date, Appellant telephoned the school office to
speak with her. During the conversation, Ms. Hall told Appellant that
several parents in her classroom were very concerned with the book
orders they had placed with Ms. Rodriguez in September. Ms. Hall
asked Appellant if she knew where the books were and she responded
that they were at her house. Ms. Hall then asked if Appellant would
deliver the books to the school. When Ms. Rodriguez said she was
sick, Ms. Hall volunteered to personally drive to her home and pick up
the books; however, Appellant declined to provide her address. At
that point, Ms. Hall instructed Appellant to deliver the books to the
Andersen Air Force Base main gate and Ms. Hall would ensure they
were delivered to the children. Although Appellant agreed to this
procedure, she did not follow it. Instead, she gave the books to Ms.
Flores and asked her to distribute them for her. (Tab 4aa.)

For her part, Appellant denied that Ms. Hall ever volunteered to
personally pick up the books from her home, or that Ms. Hall ever
instructed her to deliver the books to the Andersen Air Force Base
main gate. Rather, Appellant testified that the "main gate" solution

41

was a "suggestion" and not a directive by her supervisor. Although once again, there is credibility issue between Appellant and one of her supervisors, the Agency contends it is easily reconciled.

Appellant obviously has a motive to lie about the facts of this incident, *i.e.,* to avoid discipline for failing to follow instructions. But what possible motive was there for Ms. Hall to lie about offering to drive to Appellant's house and pick up the books, or instructing Appellant to deliver the books as far as the main gate (a compromise so Appellant would not have to come into the school)? Absolutely none. Ms. Hall's testimony is certainly far more credible than that of the Appellant.

Counsel for Appellant tried to point out that because the books ultimately were delivered to the children there was no "foul", and therefore, Appellant should not be found to have engaged in any misconduct. However, he misses the point. The Deciding Official, Mr. Doug Kelsey, aptly pointed out that by failing to follow Ms. Hall's instruction, Appellant called into question her ability to follow any instruction or direction by management, and that school officials had lost all confidence in her ability to follow the orders of her superiors.

Under these circumstances, the Agency believes that the specification has been proven.

42

### 3. There Is Nexus Between The Misconduct And The Efficiency Of The Service.

Under 5 U.S.C. 7513(a), a Federal employee can be disciplined only "for such cause as will promote the efficiency of the service." This requires an agency to demonstrate a relationship, or nexus, between the sustained charge(s) and the efficiency of the service.

As a general rule, there must be a reasonably foreseeable specific connection between an employee's conduct and the efficiency of the service before any adverse action may be taken by the Agency. Stated differently, there must be a clear and direct relationship between the articulated grounds for an adverse personnel action and either the employee's ability to accomplish his or her duties satisfactorily or some other legitimate governmental interest. Steve v. Dept. of Air Force, 14 M.S.P.R. 491 (1983). Although a showing of nexus is required in all cases, it does not have to be alleged in a proposed letter. Rather, nexus may be inferred from the facts or charges described in the proposal letter. Brooks v. Corrado, 999 F.2d 523 (Fed. Cir. 1993). Because most "on-duty" offenses by their very nature are inherently connected to the efficiency of the service, nexus is presumed.

The Board has repeatedly and consistently held that unauthorized absence, by its very nature, disrupts the efficiency of the service. Crutchfield v. Dept. of Navy, 73 M.S.P.R. 444, 448 (1997); Lovendusky

43

v. Dept. of the Army, 64 M.S.P.R. (612, 617 (1997); Roby v. Dept. of Justice, 59 M.S.P.R. 426, 429 (1993); Johnson v. DLA, 54 M.S.P.R. 370, 373 (1992). The Board and the courts have held that there is an inherent relationship between continuous unexcused absences and the efficiency of the service because an essential element of employment is to be present on the job when expected. Ajanaku v. Dept. of Defense, 44 M.S.P.R.,350, 355 (1990); Gibbs v. Dept. of Navy, 33 M.S.P.R. 261, 264, aff'd 837 F.2d 1097 (Fed. Cir. 1987); Davis v. VA, 792 F.2d 1111, 112-13 (Fed. Cir. 1986); Urbina v. U.S., 530 F.2d 1387, 1390 (Ct. Cl 1976). To allow an employee to remain away from work without leave seriously impedes the function of an agency, imposes additional burdens on other employees and, if tolerated, destroys the morale of those who meet their obligations. Davis v. VA, supra at 1113; Ajanaku, supra at 355. As stated by the Court of Claims in Urbina, supra at 1390, "If all employees of the Government could decide when and how long they could have sick leave without any advance approval by proper officials of the hundreds of agencies and departments by whom they are employed, we would have chaos in our Government."

The Agency would respectfully assert that disorderly conduct and failure to follow instructions are "on-duty" offenses for which nexus is presumed.

44

(1) The first specification of disorderly conduct relating to the Appellant's conduct in her classroom on 11 October 2002 occurred on Agency premises and in front of the students by whom she was responsible for providing supervision and instruction. The nexus here is direct and obvious. The second sustained specification of disorderly conduct related to the Appellant's harassing telephone calls to Ms. Deborah Webster, the parent of one of her students. While occurring "off duty" this offense is directly related to the interests of the Government in that the Appellant's inappropriate contact with Ms. Webster directly flowed from events which occurred on duty and in the worksite on 11 October 2002, and Ms. Webster reported the events to the Agency as she expected the Agency to correct or remedy the situation.

(2) All of the specifications of failure to follow instruction, both those occurring "on-duty" and those occurring "off-duty" have direct and unmistakable nexus. It goes without saying that a Federal Agency has the right to demand its employees follow legitimate instructions given to them by supervisory personnel. An Agency where employees could choose to follow, or not to follow, instructions given by supervisory personnel would be extremely chaotic, dysfunctional and inefficient.

Finally, the offenses of AWOL, disorderly conduct, and failure to follow instructions, if tolerated, destroy the morale of other employees who meet their obligations. Under these circumstances, there should

45

be no difficulty finding nexus in this case to support the action of removal.

### 4. The Penalty Imposed By The Agency Is Reasonable In Light Of The Specific Facts And Circumstances Involved In This Case.

The Merit Systems Protection Board will review an agency-imposed penalty only to determine if the agency conscientiously considered all relevant factors and exercised management discretion within tolerable limits of reasonableness. Thomas v. Dept. of Air Force, 67 M.S.P.R. 79, 82 (1995); Pencook v. USPS, 67 M.S.P.R. 409, 445 (1995); Douglas v. VA, 5 M.S.P.R. 280, 306 (1981).

The Deciding Official, Mr. Doug Kelsey, testified regarding consideration he gave to the relevant factors more commonly known as the "Douglas Factors." (Tab 4mm.) This consideration included Mr. Kelsey's analysis as to which factors he weighed against the Appellant, and the rationale, as well as which factors he weighed in her favor, or those which he concluded were "not applicable." Thus, the evidence of record is clear that the Deciding Official thoroughly and meticulously weighed each of the *Douglas* factors prior to selecting the penalty of removal.

As noted above, the Agency contends that all of the charges have been proven by a preponderance of the evidence in this case. Under those circumstances, Mr. Kelsey's selection of removal as the appropriate penalty should be entitled to great deference by the

46

Board. Lachance v. Devall, 178 F.3d 1246 (Fed. Cir. 1999). Even if it is found that the length of the major AWOL offense (Charge I, Specification 3) should be decreased to four weeks instead of 6 weeks (because Appellant had 84 hours of available sick leave), the offense constitutes an extremely serious charge of AWOL for which removal is still appropriate and well within tolerable limits of reasonableness. *See e.g.,* Lawson v. Dept. of HHS, 102 FMSR 80111 (2002).

Accordingly, the Agency avers that removal is a reasonable penalty in this case since all the charges have been sustained.

### B. The Agency Did Not Engage In Illegal Discrimination When It Removed Appellant From Her Position.

In Appellant's Pre-Hearing submission, her counsel alleged that: "In the months leading up to the events of October 11, 2002, Principal Joe Masters subjected Appellant to sexual harassment and other forms of harassment, thus creating an atmosphere of tension which contributed greatly to the disruptive and emotional events of the day." (Appellant's Statement of Affirmative Defenses dated 18 July 2003.) Counsel further averred in the same pleading that Appellant had previously filed an EEO complaint, and that the Agency's action in removing her from employment constituted illegal discrimination based on race, color, ethnicity, and retaliation. The Agency does not concur with these assertions.

47

Allegations of illegal discrimination by an Agency against an employee who has been removed from employment for misconduct constitute an affirmative defense for which the Appellant bears the burden of proof.

### 1. **Sexual Harassment.**

Appellant presented evidence (her own testimony) that between September of 2000 (when Mr. Masters arrived at Andersen Elementary School as the Principal) and October 11, 2002, the date of the incident which formed the basis for much of the misconduct in this case, that Mr. Masters engaged in a pattern of sexual harassment against her. Appellant's "evidence" of sexual harassment consisted of three events:

(1)  September 2000:  Appellant claims at their first meeting at a "welcoming breakfast" that Mr. Masters shook hands with her, held her hand too long, and "undressed her with his eyes";

(2) October or November 2000:  Appellant alleges the two encountered one another outside the school building, that Mr. Masters came up to her and proclaimed "smells good" as he looked at her;

(3) December 2001:  Lastly, Ms. Rodriguez avers that Mr. Masters was dancing in a lewd fashion with another female employee (Mrs. Berrios) at the District Christmas party.  Appellant stated that she was to be his next dance partner, that she rejected him, and he gave her a "dirty look" over the rejection.

48

The Agency first questions the overall credibility of these allegations. On cross-examination, Appellant was asked if she considered these actions by Mr. Masters to constitute "serious allegations of sexual harassment"—to which Appellant said "Yes." Yet, she then stated that she never filed a timely complaint of discrimination with the Agency's EEO office. Appellant raised these contentions for the **first** time in her response to the notice of proposed removal—over two years after the first two incidents, and 15 months after the third incident. (Tab 4j.) [11] Mr. Kelsey quickly investigated the matter and obtained statements from available witnesses. (Tab 4i.) None of the witnesses corroborated Appellant's claims.

To establish the affirmative defense of sex discrimination based on sexual harassment (*quid pro quo*), the Appellant must prove: (1) that submission to unwelcome sexual advances, requests for sexual favors, or other verbal or physical contact of a sexual nature was made an explicit or implicit term or condition of her employment; and (2) that the Appellant's rejection of such conduct was a contributing factor to the imposition of the action (removal) appealed to the Board. Here, it is unlikely that a handshake with gazing eyes, a verbal comment (smells good) with another "look," and an overture to dance at a group party would constitute sexual advances or requests

---

[11] Appellant did contact an Agency EEO Counselor by e-mail on 17 October 2002 alleging that Mr. Masters sexually harassed and assaulted her on 11 October 2002. (Tab 3.) She made a vague reference to "incessant harassment for more than two years," but did not mention the three incidents described to Mr. Kelsey in the oral response to her notice of proposed removal. The Counselor tried to investigate the matter, but Appellant would not cooperate. No formal complaint was ever filed.

49

for sexual favors. Additionally, there has been no showing that the incidents in question were made an explicit or implicit term or condition of employment. The alleged harasser (Mr. Masters) did not propose or act as the Deciding Official in this case.

Nevertheless, even if it is presumed that Appellant established a *prima facie* case of *quid pro quo* sexual harassment, the Agency has clearly articulated a legitimate, non-discriminatory reason for its actions, *i.e.,* it removed Appellant from employment for three charges (multiple specifications) of serious misconduct. Appellant presented no evidence whatsoever that Mr. Kelsey's decision to remove was pretextual. Under these circumstances, Appellant's allegation of sex discrimination must fail.

## 2. Disparate Treatment Discrimination.

Appellant's claim that her removal was based on race, color, and ethnicity, is also without merit.

To establish the affirmative defense of discrimination based on disparate treatment, Appellant must show: (1) that she is a member of a protected group; (2) that she was similarly situated to an individual who was not a member of the protected group; and (3) that she was treated more harshly or disparately than the individual who was not a member of her protected group. *See generally* McDonnell-

Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

While Appellant has demonstrated that she is a member of a protected class, she has offered no evidence that she was treated more harshly or disparately than another similarly situated employee not a member of her class; in fact, she offered no comparative evidence at all. Accordingly, she has not met her burden of a *prima facie* case of disparate treatment discrimination.

### 3. **Reprisal.**

Appellant also avers that her removal was the result of illegal discrimination based on reprisal and retaliation. Specifically, she alleges that she had filed a formal EEO complaint in May of 2002, and that the Agency's action in removing her from employment was because of her action in filing that complaint.

To establish a *prima facie* case of discriminatory retaliation, the Appellant must show: (1) participation in an activity protected under Title VII; (2) knowledge of that activity by the Deciding Official; (3) an adverse action against the appellant; and (4) a causal connection between the protected activity and the agency's adverse action. Johnson v. Palma, 931 F.2d 203 (Fed. Cir. 1991). A causal connection may be established by showing that the protected activity was followed closely by discriminatory or retaliatory treatment, that the

51

agency treated the employee differently from similarly situated employees who had not participated in EEO activity, or that the agency treated appellant differently than it treated her before she engaged in the protected activity.

In the present case, the Agency acknowledged that Appellant participated in prior EEO activity. She filed a complaint in May of 2000 which the Agency dismissed for untimeliness, and Appellant's appeal to EEOC/OFO was denied. Appellant filed a second formal complaint on 14 May 2002 which is currently pending a hearing before the EEOC. Additionally, it appears that Mr. Kelsey knew of the complaint in late February 2003 (or shortly thereafter) when he became the Acting Guam DDESS Superintendent. However, Appellant presented no evidence of a causal connection between Appellant's 14 May 2002 filing of an EEO complaint, and her 17 May 2003 removal for misconduct. One full year separated the two events. As such, the protected activity was **not** followed **closely** in time by an adverse action. Nor has Appellant shown that the Agency treated her differently from similarly situated employees who had not participated in EEO activity, or that she was treated differently than she was treated before she engaged in the protected activity.

52

Finally, even assuming that a *prima facie* case of retaliation has
been established, the Agency clearly articulated a legitimate, non-
discriminatory reason for its action, *i.e.,* an appropriate and reasonable
disciplinary response to serious misconduct.

### C. The Agency Did Not Fail To Follow Progressive Discipline.

Counsel for Appellant also alleged in his filing on Affirmative
Defenses that: "The Agency did not proceed with progressive
discipline." (Appellant's Pleading on Affirmative Defenses, para. 10.)
The Agency disagrees.

Section 1.d. of the parties' Master Labor Agreement provides as
follows:

> The Agency recognizes the concept of progressive
> discipline, and generally actions imposed should
> be the minimum that can reasonably be expected
> to correct and improve employee behavior and
> maintain discipline and morale among other
> employees.

(Tab 2, p. 109.) As Mr. Kelsey explained on direct examination,
recognition of the concept of progressive discipline does not bar
removal for a first offense if the first offense(s) is serious enough.

The Agency's disciplinary instruction clearly embraces the
concept of progressive discipline, since it provides a "Schedule of
Offenses and Recommended Remedies" for first, second, and third
offenses. (Tab 4ll, enclosure 2.) However, that same schedule

authorizes removal for a first offense of AWOL (more than 5 consecutive workdays), and for disobedience or failure to carry out work instructions. (*Id*., pp. 2-3 and 2-5.) The Instruction also provides that "remedies greater than those shown can be appropriate when an aggravated offense, frequent infractions, and simultaneous multiple offenses are established." (*Id*., p. 2-1.)

Appellant's argument on this issue is simply without merit.

## V.

## CONCLUSION

For all the reasons stated above, the Agency has demonstrated that the alleged misconduct has been proven by preponderant evidence, that there is a nexus between that misconduct and the efficiency of the service, that the penalty of removal was reasonable under the circumstances, and that the Agency has not engaged in illegal discrimination or failed to follow the applicable collective bargaining agreement or its disciplinary instruction.

54

Therefore, the Agency respectfully asks that the Administrative Judge issue an Order sustaining the Appellant's removal and denying her appeal.

Respectfully submitted,

Robert E. Sutemeier
Associate General Counsel
Office of General Counsel
Department of Defense Education Activity
821 San Carlos Road, Building 3813
Pensacola, Florida 32508-5531
(850) 452-9401 // Fax (850) 452-9405
E-mail: robert.sutemeier@cnet.navy.mil

Agency Representative

Submitted this 28th Day of August 2003.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Agency's Post-Hearing Brief,

Docket Number SE-0752-03-0308-I-1, dated 28 August 2003, was

sent, as indicated to the following:

SENT VIA FEDERAL EXPRESS (FEDEX) MAIL ON 28 AUGUST 2003:
Ms. Carol J. Teather
Administrative Judge
Merit Systems Protection Board
Seattle Field Office
915 Second Street, Room 1840
Seattle, WA 98174-1056
206-220-7975

SENT VIA FEDERAL EXPRESS (FEDEX) MAIL ON 28 AUGUST 2003:
Mr. David J. Highsmith, Esquire
194 Hernan Cortes Avenue
Suite 209, Union Bank Building
Hogatna, Guam 96910
(671) 477-8168

Respectfully submitted,

*Marcia Mariea Webb*

Marcia Mariea Webb
Legal Technician
Department of Defense Education Activity
Office of General Counsel
821 San Carlos Road, Bldg. 3813
Pensacola, FL 32508-5531
Telephone: (850) 452-9401
Facsimile: (850) 452-9405
E-mail: marcia.webb@cnet.navy.mil

Done this 28th Day of August 2003.